Good morning, owners, and aloha. I'm Bill Burgess, attorney for the plaintiffs. The plaintiffs are 14 individual citizens. With their diverse ancestries, they're typical of the population of Hawaii, the most intermarried, racially blended state in the nation, perhaps in the world. I'm pleased to introduce seven of them. They are Mr. Earl Arakaki, Sandra Buonanni Burgess, Patricia Carroll, Robert Chapman, Tole Kravitz, James Kuraiva, and Erson Twig-Smith. Thank you very much. These plaintiffs come to the federal courts to challenge the validity of two state agencies, the Department of Hawaiian Homelands and the Office of Hawaiian Affairs. No matter how well intended these two agencies were when they were created, their only purpose and only reason for existence is to segregate certain public lands and monies and use them exclusively for persons of a particular ancestry. What's wrong with that? The Supreme Court in Rice explained that ancestry can be a proxy for race and quoted from Hirabayashi v. U.S., which was a due process claim under the Fifth Amendment. Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality. How does that hurt plaintiffs? Just since 1990, these two state agencies have depleted from the state treasury, either by the itemized calculation of that is the further excerpts of record 3A and 3B. Plaintiffs' taxes helped pay that $1 billion, but plaintiffs are excluded from sharing the benefits solely because they're not of the right ancestry. Let me ask you a question. I tracked all of this and something confused me. Maybe you can help me. I understand that some of the revenues come from leases of lands that come from the trust properties. Am I correct in that? Yes, sir. Therefore, you would argue that that was tax revenues also, those leased payments? The leased payments wouldn't be tax revenues, but they affect the taxes directly because instead of going into the general fund and being used, they go for an illegal purpose, and that means that the taxes have to be more. I think you would be asking us then to create another case of first impression relative to that issue and how it impacts on taxpayers' jurisdiction, I guess. Is that correct? Well, we also have a trust beneficiary as well, Your Honor. I understand that. I think that maybe I can ask the question in a slightly different way. On the issues that require taxpayers' standing, it's my understanding of our previous cases that taxpayers' standing works only to the extent that there are direct expenditures of tax or something, not an indirect effect. And so are you asking us to expand taxpayers' standing for those claims that don't involve direct general fund expenditures? Your Honor, it's my understanding that that direct payment of taxpayer money is not a requisite for state taxpayer standing. It is for federal. Federal taxpayers only have standing under the tax and spending clause of the Constitution, and that would be direct. But in the case of states, the state taxpayer standing, it includes any conduct of the government which increases, has the effect of increasing the taxes that the taxpayers pay. And what is your best case authority for that view of state taxpayer standing? Hoʻohuli is, of course, the leading case in the mind circuit in the taxpayer standing, and that's the basis for it. In fact, the trial court in this case repeatedly indicated that the allegations in our complaint were virtually identical to the allegations in the Hoʻohuli case. Well, the next issue, I understand what you're telling me. I have to think a little more about this question of the parallel state taxpayer standing versus the federal taxpayer standing in the Hoʻohuli case. There's another one that I'm trying to sort out. When the settlement was made on the alleged breach of trust, it's my understanding that there was a bond, public bonds were issued to finance the settlement. Is that correct? Yes, that's correct. And then somehow those bonds would be paid off, and somehow that revenue would flow. Can you tell me how that fits into your basis for your jurisdiction? Well, that was a 1993 payment of $135 million to the Office of Foreign Affairs, and that was supposed to settle the back, their portion of the back revenues from 1980 through 1991. And those were trust monies that they were talking about that were improperly used? They were basing the calculations on what they calculated as revenues of the public land trust. It should have come out to certain purposes. That was the theoretical basis for it. Okay, so then they had a settlement amount, but the amount that was paid as settlement of those claims came from a bond issue. That's my understanding, Your Honor. So it didn't come directly from any tax money or trust money? That's correct. Now, how do you tie, but I guess the bonds have to be paid back. Is that where your theory ties in? Yes, Your Honor. So where does the money come from? That's just like my credit card or any taxpayer's credit card being assessed for $135 million or whatever the amount is. It was a financing vehicle. Simply a financing deal, but the money still hits the taxpayer's right pocket. Okay, now where does the money come to pay off those revenue bonds? I don't think there's any revenue bonds there. No, I didn't mean revenue bonds, but those special bonds. General bonds. That comes out of the general fund. That's where that consists of almost entirely of taxes. Well, but the general fund also includes those lease payments, doesn't it? Not many of them. Not many. The general fund, and that's itemized in our every year of at least, I think, 93 or 94% of tax revenues. There are some revenues that are accounted for in the general fund, but most of the revenues are accounted for in different special funds. I mean, most of the revenues from the lease rents are accounted for in other special funds. So there's a little that says, you know, refers to rents, but it's a tiny proportion of the general fund. So it's the bonds, it's mostly tax money then? Mostly, yes. Over 90% would have to be. Of course, they don't, when they make a check, they don't say this is tax money. Sure. But then, is the trust theory then again bound up with the state taxpayer standing in that analysis? Or are these beneficiaries who have a right to sue because of the breach of trust? The plaintiffs, every one of the plaintiffs is a beneficiary of the public land trust, and every one of them brought this claim as a beneficiary as well as as a taxpayer. As a beneficiary of the public land trust. Another point along what your honor asked, the public land trust generates revenues from rents primarily, and then it also has expenses, and it pays those expenses from the trust revenues, and any trust, the trustee is supposed to pay the trust expenses out of the revenues before the trustee may lawfully make any distribution to beneficiaries. The state as trustee does not file a trust accounting for the public land trust, and therefore it's very difficult. It's probably the expenses of the public land trust equal or exceed the revenues, simply because most or many of the lands in the public land trust you know there's roads and parks and playgrounds and schools and they don't generate much income and they do generate tremendous expenses. So it's likely, although we don't know for sure and we weren't able to find out from the state because they simply don't keep trust accounts, but it's at least possible that the trust, the public land trust generates no net income from which as a trustee it could make any distribution to any beneficiaries. Nevertheless, the state when it makes what it says are distributions of the ceded lands or the public land trust, it cuts the gross and it gives 20% to Omaha and it sends them the check quarterly. How do they make up, if your theory, if we're to consider your theory, as a record show, how do they make up the difference in the cash flow? Taxes. Excuse me? Tax money. They make up the difference in taxes. Is that because the funds are all commingled and or do they bring money directly over? Are these separate trust funds? No, they're not. They're not segregated. They all go into the state treasury which is a depository of depository accounts. So it's commingled. It's commingled. I'm sorry. I'm going to ask you to shift just a little bit if you want to finish up. I'm curious about how you reconcile our decision in Carroll which seems to suggest that the United States is a necessary party to these proceedings. Carroll didn't bring a suit against the United States and Patrick Barrett, who was the plaintiff in the consolidated Carroll case, he applied his basis for the standing was that he wanted a homestead lease, a homestead lease. In his deposition he said, he was asked, do you challenge any federal laws? He said, no, I have no desire to challenge any federal laws. He said, do you have any desire to sue the United States? He said, no. And the court based on that said that since no federal laws are challenged and the plaintiff unequivocally said that he doesn't have any claim against the United States, he said that we're not able to redress his injury because the state is prohibited by federal law from changing the beneficiary requirements for the Hawaiian homestead leases. And therefore, without permission from Congress. And given then that you can't, that Hawaii cannot change these programs without permission from Congress, doesn't that make the federal government then a necessary party to this? In other words, even if we were to say, yes, you've got standing, go ahead and proceed. And if the district court and later this court, the Supreme Court were to say, yes, you win, Hawaii cannot make those changes without permission from Congress, which we cannot order. Now, why doesn't that make the United States a necessary party? And if so, then haven't we got some difficulties here? We, we, we agree. We think the United States is a necessary. Okay. But if the United States is a necessary party, then you have to have some basis in order to bring the United States into this suit. And that means then that we're going to have to talk about federal taxpayer standing. And then we're going to have to talk about whether the United States can be sued as a trustee on the beneficiary theory. So you're going to have to have some basis in order to bring the United States into this, into this suit. We, well, of course we did bring a suit against the United States. Right. And, and we, what's your, what's your standing for suing the United States? It's as state taxpayers and it's also as trust beneficiary. Okay. But how can you sue, how can you claim state taxpayer standing in order to bring the United States into this suit? Because the United States requires the state to spend monies and in violation of the constitution and those, the duties imposed by the federal government on the state result in increased taxes. And the U.S. knew that in 1959 when it imposed on the state of Hawaii the requirement to adopt the Hawaiian Homes Commission Act. So you're suggesting then that your basis for suing the United States is not under a theory of general federal taxpayer standing. Right. But some kind of, but the, but this, this much narrower state taxpayer standing principle out of, out of our Hulhuli case. Yes, that's correct, John. Under Hulhuli, state taxpayers have the right to bring a suit against anybody who causes their taxes to increase. Now, wouldn't that, counsel, if that were, if that were true, then let's suppose that we had a law enacted by Congress that affected some kind of, some kind of region of the United States, or it imposed some kind of disparate impact as a spending program on certain, on certain areas. You have Alaskan lands, or we had some kind of national parks bill or something like that. Wouldn't then we have standing to sue the federal government on the grounds that it affected our state disproportionately to some other state? Well, if it's just an unfunded mandate from the federal government, I don't think that would necessarily give, give a state taxpayer standing. Let's suppose the federal government's actually spending money. The federal government would be actually spending money for a particular... Some program that has a, that has a greater impact on some states rather than other states. Can that program be challenged on the, on the grounds that whether or not I'm directly impacted by the, by the, by the statute, I pay federal, it causes me to pay more money to, in state taxes. Well, that's, that's, it's, it's a little bit removed from our case. It's, and it's a more difficult case that Your Honor is posing, but our case is the, first of all, the U.S. took the public lands of Hawaii, I mean took, they were offered by the Republic of Hawaii in 1898, offered to the U.S. in trust to be held for the benefit of the inhabitants of the Hawaiian Islands, not put into the federal land bank, and the U.S. in the annexation act accepted them subject to that trust. Then in 1950, well, in the meantime, 1921, it was a race-neutral public trust when the, when Hawaii gave the U.S. its public lands. The U.S. in 1921 added a racial component to it, and then in 1959, when the U.S. gave the property back, it said, here's your lands, but I'm going to hold some strings. It's not, here they are and they're yours and all yours again. Your lands, which are now returning to you, said, the government said, we're holding strings, and those strings were the requirement that the state has to sign a compact with the U.S., that it has to comply with and carry out the Hawaiian Homes Commission Act, can't change it without the permission of the state, has to use 200,000 acres of your own land, you have to use it only for the purpose of carrying out this act. Now, in 1959, in the record, we've indicated that at hearings about statehood, previous, many years previous to that, there were discussions of the fact that the territory of Hawaii had to subsidize the Hawaiian Homes Commission Act in order to take these lands, develop them, and make them suitable to build infrastructure so that they could be used for homesteads. And that didn't come from the lands, it came from tax monies, and they were grumbling about whether it was going to be enough or not. Counsel, just to warn you, you have only about a minute left. I don't know if you wanted to reserve some time for rebuttal. Yes, I do. I didn't realize I had that little time. I would like to reserve some time. Thank you. Ms. Broder? Good morning, Your Honors. We have four separate counsel that are going to be arguing, one for the United States of America, one for the State of Hawaii, and one for the State Council of Hawaiian Homestead Associations. I am here this morning representing the Office of Hawaiian Affairs. With regard to the Office of Hawaiian Affairs, we believe that the district court was correct in determining that it was a political question as to whether or not the plaintiffs could bring a claim against the Office of Hawaiian Affairs. How does the recent case, which I can't pronounce, affect your argument? I don't think I pronounced that right, but it was just filed on October 27th. Your Honor, you did a pretty good job. Kaha wai ola'a. I believe that that case actually clarifies, I think, our position that it is a political question. Now, in that case, the Ninth Circuit did decide that it wasn't a political question, but that was regarding acknowledgment regulations. Now, the court pointed out, of course, that the acknowledgment regulations have a sign hanging over them saying, Native Hawaiians need not apply. So in that situation, we have regulations that have been promulgated by an executive department, which are subject to the Administrative Procedure Act. And so the court concluded under that kind of a situation, it could apply the rational basis test on the exclusion of Hawaiians from the regulations. However, the court went on to discuss the history of Native Hawaiians and the fact that Native Hawaiians and their history and their treatment by the United States is totally unique. They have not been able to, they had treaties with the United States of America between 1820 and 1880. So for a period of 60 years, the Hawaiians were recognized as subjects of an independent sovereign nation of equal stature to the United States. Counsel, I see how that could potentially affect the analysis, but I'm not sure why it affects the justiciability of the claim. In other words, we regularly hear cases involving Indian tribes that had sovereign and have treaties with the United States. We have certain things that we analyze, but we don't say hands off. And similarly, with a typical equal protection claim, we don't say hands off. Why should we use these? Well, in this case, I think there's an impossibility of deciding the case without making an initial policy determination. And that policy determination is being made by Congress. Just this last year, in 2004, Congress passed in one of its appropriation bills, the creation of the Office of Native Hawaiian Relations in the Department of Interior. This is part of an ongoing process pursuant to the Apology Resolution, where Congress called upon the President of the United States of America in 1993 and the Congress committed itself and asked the Executive to also commit itself to make amends and to pursue this process. So this process has been ongoing. So you view it in a sense as the foreign relations power exercised a little late? Well, I suppose, Your Honor, that the treaty clause is, I think, extremely relevant here. And there is, I think, some of what you're saying involved in this situation. And I think, going back to some of the earlier questions about state taxpayer standing, what OHA does is inextricably intertwined with what Congress does. And so, in other words, OHA administers, for instance, the Native Hawaiian Revolving Loan Fund. That is a program that is Congress. Congress passed a program to give loans to Native Hawaiian. The Office of Foreign Affairs is supposed to match that money and then make the loan. So there we have an inextricably intertwined. Counsel, are you suggesting then that if we had a challenge to the Congressional Act, we would similarly not be able to hear that case? Let's assume away the taxpayer standing problem. Well, I think that's a good question. And I guess I would have to say that that would still be non-justiciable at the present time. So any challenge to any act, whether it's a state act or whether it's an act of Congress that has a special benefit in it for Native Americans is non-justiciable? No. I wouldn't say for Native Americans. I'm sorry. I'm sorry. For Native Hawaiians. I meant to say Native Hawaiians. Okay. I would say for Native Hawaiians at the because the process is ongoing. We are going on a journey. We have an office that's just been created in the Department of Interior. We have Congress taking particular steps right now, moving in that direction. And the Ninth Circuit in Kahawai Olaa specifically criticized the Department of Interior for doing nothing for Native Hawaiians and for not doing the kind of using their expertise in their department. And so they were particularly criticized for that. And I think in Kahawai Olaa, the Ninth Circuit relied on the apology resolution and some of its findings. Also looked to the patchwork quilt, I guess is what they were talking about, of the statutes, the legislations, the treaties, the history, and the lack of dealings basically over the years by the executive with the Native Hawaiian people. I read your argument and I'm listening to it and I seem to get the same impression now that I did in your briefs. It seems as though when we deal with sovereigns within the United States, the Indian issues, some of the issues we've had in Alaska, they all seem to be different. Are you saying that Hawaii is in progress of transition and Congress has not yet crossed that line where we have maybe with the Native Americans and the dealings we had with Indian country? And that at this point, we're to stay out until Congress passes that line. But in your analysis, Congress has not passed that line and at this point, we stay out. Well, I would say that OHA disagreed with the district court on that and that your summary is what the district court summarized and how she thought about it. I guess from our point of view, we would say Congress has recognized Native Hawaiians. Well, tell me how we deal with OHAI because there's the issue of whether we have to address the level of scrutiny and then there's this greater issue about the political question. And it seems to me that Congress at any day can wipe out all sovereignties if they want to. And you're saying that somehow if we read this, we have found that Congress does not want to do that yet. We're still in this formulation stage where we're not when we talk about Indian country. Well, I would look, I guess, seriously upon the apology resolution and Congress expressed its deep regret and apologize to Native Hawaiians for the treatment that was rendered to them. And so I would say that at this point in time, yes, there is policy determination, initial policy determination that this court would have to make to enter into the arena of what is going on between the United States of America and Native Hawaiians. Well, does that necessarily mean that when we talk about these tax issues, that the Congress has allowed certain sovereignty things to happen with regard to Native Hawaiians, where that might not apply in Indian country because of the unique situation with the Hawaiian walking into that when we start talking about taxpayers. There's no question about that. Is that is that your position? I would say that that's a fair summary. And so we're going to have to deal with our latest October decision somehow. Yes. Counselor, your colleagues. So I would apologize to the court. That's okay. You'll have less time to talk. That's an important issue, though. That's a very important overarching issue. Well, I'm certainly willing to answer more questions as long as I don't take from my colleagues. Thank you. May it please the court, Aaron Avila on behalf of the United States. Plaintiffs argue for an extraordinary proposition that a state taxpayer can establish standing to sue the United States and challenge the constitutionality of a federal statute based solely on his or her status as a taxpayer. Plaintiffs have identified no decision from any court approving of such a result. The district court properly rejected that argument. As the panel's questions illustrated, this court, to the extent it has recognized state taxpayer standing, has only done so to particular challenges to state statutes that distribute state tax funds. That was my original question. I'm having a hard time tracking this state. It seems to me when you take a dollar of state tax money and you over against an expenditure, that can track, but there seems to be some indirect stuff here relative to how the state revenue is tracking. I was confused as to those two issues I questioned about. Well, perhaps the state can address more how they do their bookkeeping, but the fact of the matter is the federal statutes at issue here do not require the state to tax anyone. It only deals with income and revenues from the ceded lands, and it does not require... Plaintiffs have a dispute with the way the state is spending its tax dollars. That's an issue between plaintiffs as state taxpayers and the state. It has nothing to do with the federal government or this federal statute that they challenge here. The only other basis that they asserted for standing was this trust beneficiary status, but there is no injury in fact under that. They have not alleged a cause of action against the United States, and unless the panel has questions about that, I'll defer to my colleagues or about the state taxpayer standing. I do have one question. Does the United States have a position on the political question issue here? Well, I think the court's recent decision just last week makes that a little more difficult. I don't think that in the hypothetical you posed, that political question precludes the court from any statute that deals with Native Hawaiians. Well, I'm going to have to look more carefully at that October decision, but I'm having great concerns with the way the government is handling the Hawaiian question, as we had great concerns with the Indian country. I've been playing 20 years with the Indian country, and I've been playing a little bit with this for 20 years, and my concern is that overarching issue. When you're going to lap out the sovereignty, it's got to be pretty specific. I don't know what we did in October, to tell you the truth, but there's got to be some affirmative action, some very strong action. When we've, for years and years, given this sovereignty issue, all the preeminence we have, and with the monies, to now say that one decision of our court has done it, we might be bound by it. How do you say that our activity in October, what in that decision shows you that somehow that sovereignty issue has been decided, so it's no longer a political question? I'm not saying the sovereignty issue has been decided. I don't think that the United States has not established a government-to-government relationship with Native Hawaiians. So are you going to get rid of the political question? I don't think that what level of scrutiny one applies to a statute of the deals with Native Hawaiians is a political question, I guess is what I'm saying. So you disagree with OHA's position, and you don't think it's a political question? To the extent that the only question is whether, it is a political question whether or not Congress has recognized and established a government-to-government relationship with a particular group of indigenous people. But you've concluded that they have not. Right. Okay. But the standard review turns into a chicken and egg, it keeps going around. And is that enough to breach, under what we've said, the way, you just don't breach sovereign immunity with a few words, you've got to do it very specifically. We're doing it this way by saying the standard review is driving it. Is that right? I don't know if sovereign immunity is the right term in this context. If it's not sovereign immunity, that's about the only thing left when it comes to between governments is sovereign immunity, isn't it, of the Hawaiian people? And what that means in this context. That's correct, but I don't know that you have to address that in this case. The problem here is that Native Hawaiians have never been granted the status of Indian tribes, is that correct? Correct. That question has yet to be resolved. There are acts in Congress that suggest that that might be forthcoming. There are proposals in Congress that would do that, but it hasn't been done to this point. Right. Congress has dealt with Native Hawaiians differently than it has with other indigenous groups, and it has not established a government-to-government relationship. And they know how to do it if they want to do it. And politically, they haven't done it, I mean, that would be the argument. Which means then that having failed to establish Native Hawaiians as a recognized sovereign akin to an Indian tribe, then we are left with the question of ancestry being a racial classification. Well, in this case, I think Congress can deal with indigenous peoples without having strict scrutiny apply and rational basis review. It's within Congress's power to deal with indigenous peoples in that fashion, and not turning it into a racial classification. It's recognizing the unique history, as the October 27th opinion did, the unique history between the United States and Native Hawaiians. Doesn't Morton v. Nant Perry compel us to do something different? If we haven't recognized an indigenous people as a political basis, then doesn't that only leave us with a racial classification? I don't think Morton requires that it be an Indian tribe with a government-to-government relationship in order for the Morin v. Nant Perry analysis to apply. I'd like to give. Okay, next. Next victim. Mr. Lau. Good morning, Your Honor. Gerard Lau, Deputy Attorney General for the State Defendants and the Department of Hawaiian Homelands Defendants. I'd like to just address what Judge Bidey said. We believe that the court below was correct when she ruled that plaintiff's state tax appear standing does not afford them the right to challenge state expenditures on the Department of Hawaiian Homeland Programs or any other programs where the Hawaiian or Native Hawaiian qualification is mandated by federal law. As this court in its cattle decision ruled, the Department of Hawaiian Homelands Native Hawaiian qualification is both a state and a federal requirement, and because it is a federal requirement, any challenge to that requirement requires the participation of the United States. But plaintiffs relying upon state taxpayer standing cannot properly bring in the United States in this case because the U.S., nor anything in the relevant federal laws, requires the expenditure of state taxpayer dollars. In short, given that state taxpayer standing does not allow suit against the United States where the U.S. does not require state taxpayer money to be spent, plaintiffs cannot sue the United States. Without the United States as a party, under the Carroll decision, the plaintiffs cannot challenge the Native Hawaiian qualification in the Hawaiian Homes Commission Act because it is mandated by federal law. Does Carroll apply to the trust theory as well? Does Carroll require the presence of the United States in order to sustain theory of being able to sue the state under a trust, under the trust theory? I'm not sure it applies in the trust theory situation, but I guess arguably it's conceivable that it could apply in that context as well. But we submit that clearly as far as the state taxpayer standing doctrine is concerned, under the Carroll decision, because the Hawaiian qualifications that plaintiffs challenge in this case are mandated by federal law. I think counsel's relying on the fact that they're beneficiaries under trust theory. Right. Although he said both. He said federal, state taxpayer and trust theory beneficiaries. His primary theory is the state taxpayer standing theory, which we submit under the Carroll decision does not allow them to challenge the federal requirement in this case. As to their trust beneficiary theory, we think that has many weaknesses, as the district court pointed out below. Now, in the very beginning, I think Judge Brunetti raised the issue of whether or not state taxpayer standing could be used at all to challenge things like the seeded land revenue. We submit, and it's been very clear, as Judge Graber pointed out, that in the Ninth Circuit, state taxpayer standing is only allowed where you have a direct injury caused by the expenditure of state taxpayer dollars. And plaintiffs have tried to try and expand that doctrine to somehow say that anything that impacts the public fist somehow generates taxpayer standing. The Ninth Circuit has never done that, and it's been very clear and very restrictive in requiring an actual direct expenditure of taxpayer dollars. Does that also fit in that business of having the bonds issued to pay off the settlement? Because the money coming out of the trust goes to pay the bond holders. It isn't directly taxpayer money to the expenditure. That's correct. I think in the bond situation, there's actually two factors that the connection to taxpayer money is even more remote or doubly indirect. And first of all, as you pointed out, the bond money actually comes from private bond holders. It's only indirectly in the sense that the bonds may be paid back through taxpayer money that you get some linkage at all. But you still have an indirect link at best. Moreover, the bond money doesn't go directly to finance the Hawaiian programs. It goes to fund a settlement, a settlement of legal claims. And so you really have the Hawaiian program money being coming out of settlement monies, first of all. And then secondly, the settlement monies are actually financed by private bond holders. So you have a doubly indirect link. And plaintiff can point to no case in the Ninth Circuit that would suggest that we have such indirectness that there is somehow a taxpayer standing generated. The Ninth Circuit has been very clear in demanding direct injury caused by the expenditure of taxpayer dollars. Now, it's also our position that actually in the Ninth Circuit that state taxpayer standing is actually no longer good law. Under the United States Supreme Court in the Asarco case, a plurality ruling had basically rejected state taxpayer standing. And this court has, since the Asarco decision, never applied state taxpayer standing in a non-establishment class case. The Bell versus City of Kellogg, the Ninth Circuit, in fact, cited to the plurality decision in the Asarco case for the proposition that basically standards for federal taxpayer standing are mirrored by the standards for state taxpayer standing. So we submit that in the Ninth Circuit, the Ho'ohulhi decision is there, except possibly in the context of establishment clause challenges. Now, I see our time is up. It is, but I'm going to give Judge Klein five minutes, and I will give an additional amount of time for rebuttal as well, because there are a lot of issues to cover, and we've asked quite a lot of questions. Thank you very much. Good morning. May it please the Court. My name is Robert Klein. I represent the actual leaseholders, the State Council of Hawaiian Homestead Associations. There's an umbrella organization for Hawaiian homestead leaseholders. There's 7,000 or 8,000 leaseholders. There's a multitude of thousands more on the waiting list that are represented by Ms. Aluli sitting at counsel's table. She's yielded her time to me. The group that represents the people waiting for Hawaiian homestead leases is called Hui Ka Koho. So we represent the leaseholders, and I'm not going to reiterate everything that has been said before. I think, ultimately, the way this case is postured is it is as a standing case, and the two standing prongs asserted by the plaintiff, neither of which have merit, are state taxpayers challenging federal law in federal court, as well as being the beneficiary of an 1898 trust purportedly initiated under the Organic Act by which the territory of Hawaii was created. I say neither of those have any merit as legs or standing because of the reasons given before. The funds that are used to support Hawaiian programs either have come from bond issues whose payments are inextricably intertwined and commingled with ceded lands revenues such that you could not find a common thread. In the leading case of Minnesota, of, pardon me, Western mining, it speaks very clearly that plaintiffs have no standing to bring that challenge in federal court. As far as this idea of standing based on as beneficiaries of a long forgotten 1898 Act that has been superseded by the Hawaiian Homes Commission Act of 1921 and the 1959 Admissions Act, the United States is no longer a trustee of that trust. And while it was a trustee, I'm not sure, but I think they might have abandoned that one, and they're now on the Admissions Act issue. I'm not sure. I mean, I thought that the 1898 trust was not an issue, but I'm not sure. No, Judge, I agree with you. It was abandoned in oral argument. Judge Moway correctly pointed that out. I think it's creeped back in. But at any rate, it's pretty difficult to claim that somehow as a beneficiary of whatever trust, your lawsuit has to deal with issues concerning the terms of the trust itself. And this trust was created by the United States, whether it was in 1898, or whether it was superseded in 1921 to some extent by the Hawaiian Homes Commission Act, or later by the 59 Admissions Act. The United States changed the terms of whatever trust existed. I think a settler can do that under general trust law, and is no longer available to be sued because the program is now run by the state. I understand it, too. They're suing for breach of trust, and the trustee is doing exactly what the trust tells them to do. And that's correct. So am I right? That's the only cause of action as a beneficiary, not as a taxpayer. That's why, hence, the coupling of the two, taxpayer and beneficiary. But the beneficiary says, you're breaching the terms of the trust. Well, they're doing exactly what the trust says, as I read it. That's correct. And that's exactly what Judge Moway found in this case. Is the United States an indispensable party? I asked that question earlier, and I'm not sure I've got a complete answer. Is the US a necessary party to a trust theory of standing? Not to the taxpayer theory, but to a trust theory of standing? The US is no longer a trustee of the trust. I know the US is no longer a trustee, and that would be important if we knew that the US was indispensable. If the US is indispensable and it can't be sued as a trustee, that would suggest that the lawsuit can't go forward. Well, I think the US is not an indispensable party. I think the theory of being a trustee- You think the United States is not indispensable? Is an indispensable party. Oh, is it? Oh, OK. I must have misspoke. It is an indispensable party. But this whole trust theory, founders for many, many different reasons, not the least of which is the reason Judge Moway gave, but there would be statutory limitations issues, latches issues, the fact that the US is no longer the trustee, and we can go on and on. I think it was thrown, it was put into the complaint as an alternative manner of achieving standing because the taxpayer standing is so weak. I would like to say one thing about the political question issue. It's not the basis upon which my clients in the Department of Hawaiian Homelands was dismissed from the case. But I think, Judge Bybee, you're correct. The Admissions Act requires the state of Hawaii as a compact to undertake the legal requirements that the federal government had with respect to Native Hawaiians under the Hawaiian Homes Commission Act when it attempted to save Native Hawaiians from destruction in 1921. The United States reserved the right to consent to any changes in that beneficiary category. And I'm not so sure that the United States, as represented by the US attorney, is who that's talking about. I believe it's Congress. I believe that's what makes this a political issue, because Congress has to give consent in order to have that benefit. And you're saying no one can force Congress to consent. Exactly. It's completely within their discretion. Exactly. So having the US here represented by the United States attorney, I don't think fits the bill. I think Congress has to weigh in. And this is what's happening. We have a process right now. Hawaii was a territory. The Hawaiian Homes Commission Act was passed. It became a state. Congress, 100 years after the overthrow, apologized on behalf of the American people and said, Hawaiians and the US should reconcile. And we want to start the process of reconciliation. And that's where we are. The Akaka Bill in Congress is an attempt to reconcile. But as the Kahawai Ola'a case says, Hawaiians have always been different. They've been treated differently. Well, and I'm still hung up on this. Whether it's the Homes Act or whatever it is, it's based upon the sovereignty of the people. If it was not, if it was some statutory thing, then maybe we could be interpreting the statute. But we're dealing with the sovereign of the United States who recognizes sovereignty of the people when they gave them these rights. So it's got to be a sovereignty issue, or I don't see how you can argue that. Judge, I 100% agree with you. It is. And so our new case, which talked about Indian country and statutes relative to racial classifications, it was not a case on the sovereignty of the Hawaiian people. That was a, I'm going to read it again very carefully, but it was, had to do with Indian country. It might have mentioned things about racial classifications, but had nothing to do with the sovereignty of the Hawaiian people. I think essentially Kahawai Ola'a says that Hawaiians, there's a rational basis that Hawaiians have been excluded from DOI regulations. And it's an entire history of the United States relationship with Hawaiians that differs from the history that the United States has had with Indian people. But nonetheless. Maybe I'm beyond this case, but it seems to me all the cases we've heard regarding Hawaii have always talked about the sovereign state of the Hawaiian people. And it's never changed. And it seems to me that's still a history now. So, so the issue before us is whether or not we politically should go into this issue of Hawaiian sovereignty, which is being brought up by this taxpayer suit. Isn't that where we are? Exactly. And I, and I think Judge Maui essentially deferred on that issue. And that's what essentially Kahawai Ola'a ends with. These determinations are best made in the halls of Congress. Unless there are any other questions. I'm sure we have many, but none, not at the moment. Thank you. And we have taken up a lot of time and the other side's had some extra, so we'll give you five minutes for rebuttal if you'd like to take it. You don't have to, of course, but. Five minutes. Well, there's a lot of issues, Your Honors, that have been covered, and I think that need to be addressed, but it's going to be difficult. I'll do my best. The Kahawai Ola'a decision made it very clear that there's no Hawaiian sovereignty issue. On page 15222, they put that to rest. They said there were no recognized Hawaiian Indian tribes under federal recognition in 1934, nor were there any reservations in Hawaii. That confirms what Judge Kaye said in the district court. And they said on the next page, this is under subheading E, thus Congress has evidence on other indigenous groups. And then in footnote five, the Ninth Circuit said the critical factor is the similarity between American Indian and Alaskan Natives. I'm paraphrasing a little bit. And the contrast between them and Native Hawaiians as a whole. So this court, within the last week, has recognized that Hawaiians are entirely different from American Indians and Alaskan Natives. And this is not an Indian case. And this is not a case about Hawaiian sovereignty. This is a straightforward case about interpreting a statute that discriminates solely on the basis of ancestry, which is a proxy for race. Judge Brunetti, you said perhaps the trust argument has been abandoned. It has not been abandoned. No, I'm talking about the 1890 basis for that. That's what I'm talking about. Well, that's not what the district court said, and that's not what the record seems to be. But I may have misread that. That's incorrect. And as soon as the judge said it, we did our best to straighten it out and say, absolutely not. From the very beginning, from the time our complaint was filed to today, we have based our trust beneficiary claim on the 1898 trust, which was when the public trust was first established. We have alleged that in 1921, when the U.S. was the trustee, and it changed the trust and added the racial component. That was a breach of trust. Again, in 1959, when the U.S. required the state to adopt it with this racial component, that was a further breach of trust. It was a breach of trust by the state to accept that trust with the racial component in it and to enforce it since then. And we still allege that the change that was made. You know, you asked, the trust beneficiaries are suing for breach of trust, but the trustee is just doing exactly what the trust says. But the problem is that the trust term that was changed unilaterally by the United States in 1959, well actually it was changed in 1921 at first, is for an illegal purpose. And it's black letter, foreign book, trust law. That a trust, not only a trustee has no duty to enforce an illegal term, that hurts the plaintiffs, it has an affirmative trust duty not to enforce illegal trust terms. That's just basic elementary trust law. And that is the theory on which our trust beneficiary claim is made against the U.S. and against the state. And in addition, the violation of the trust, the change in the trust term, violates the trustee's duty of impartiality. That's violated when you, you can, it's easy enough to see it if you say a trustee holds a property for two beneficiaries. If the beneficiary says, okay, I'm going to make half of the trust corpus only for the benefit of beneficiary A, then beneficiary A also has the right to share equally in the remaining trust assets. What does that do? Does that hurt the other beneficiary? Of course. Because his beneficial interest is now only 25% and the trustee, I mean beneficiary A is 75%. That's the same thing. It's the same thing that happens here, except the numbers are different. But it takes and makes a substantial change to the value of the equitable ownership of each trust beneficiary when you make this kind of a change. It has not been, you know, we have not amended that. ASARCO is not dead. I mean, ASARCO did not kill Paul Huley. After ASARCO, this court, the Ninth Circuit, in the Kamak case, considered that question and said, no, Paul Huley remains the leading circuit case on state taxpayer standing. And I know the time is very short, but I would ask the court to look at the briefs carefully because direct injury is artificial, a direct indirect distinction. Whether a taxpayer is hurt by payment of a tax directly or whether it's paid by borrowing money or whether it's leasing valuable residential land for basically no rent. All of that hurts the taxpayer's pocketbook because almost all of the trust expenses are paid with tax money. Hawaii is not like Alaska or some other places that have high income from their public lands. We're, taxpayers are basically what support the operation of the state. And whether the injury to the taxpayer's pocketbook occurs because of an unlawful expenditure or because of an unlawful disposition of public lands so that they don't return a fair investment, the damage to the pocketbook is still the same. Thank you, counsel. We appreciate the arguments of all parties. They've been extremely helpful. And the case just argued is submitted. With that, we'll stand adjourned for this morning's session. All right. We come to that point. Right. For this reason. Well, I think. I didn't see why. Right. You know.
judges: Brunetti, Graber, Bybee